**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JULIANA MBANUSI, | * | |
| **Plaintiff,** | * | |
| | | Civ. No. DLB-23-777 |
| v. | * | |
| LIBERTY MUTUAL INSURANCE CO., | * | |
| **Defendant.** | * | |

**MEMORANDUM OPINION**

Juliana Mbanusi, who is proceeding without counsel, obtained a property insurance policy

from Liberty Mutual Insurance Company ("Liberty Mutual") to insure the personal property in her

residence and in her off-site storage unit. When a pipe in the storage unit burst in July 2018, causing

water damage to her stored property, Mbanusi filed a claim with Liberty Mutual. Liberty Mutual

retained Electronic Restoration Services ("ERS") to inspect the property, limited coverage to $250,

and otherwise denied the claim. ERS removed Mbanusi's property from the storage unit and stored

it for a year, ultimately returning it to Mbanusi with what Mbanusi believes was mold damage.

Mbanusi filed a second insurance claim, this time for the mold damage, which Liberty Mutual

denied. Mbanusi filed this suit, asserting breach of contract and negligence. Pending are the

parties' cross-motions for summary judgment. For the following reasons, Liberty Mutual's motion

is granted in part and denied in part, and Mbanusi's motion is denied.

## I.      Background

Mbanusi had an insurance policy with Liberty Mutual for the period December 4, 2017 to

December 4, 2018. ECF 149-7. The insurance policy covered Mbanusi's personal property up to

$100,000. *Id.* at 2. The coverage limit was $250 for "property, away from the 'residence premises'

used at any time or in any manner for any 'business' purpose." *Id.* at 16. The policy covered loss

from the following perils: fire; lightning; windstorm; hail; explosion; riot; civil commotion; aircraft; vehicles; smoke; vandalism; malicious mischief; theft; falling objects; weight of ice, snow, or sleet; "accidental discharge of water or steam"; and enumerated events involving hot water heaters, plumbing, heating, air conditioning, and other systems. *Id.* at 19. It also covered loss from "mold . . . resulting directly from any covered loss." *Id.* at 44. The policy excluded "[f]aulty, inadequate or defective . . . workmanship" from coverage. *Id.* at 30–31.

Mbanusi stored hundreds of items, including more than 400 electronics, in a storage unit away from her home. ECF 149-8, 158-21. She regularly shipped items from her storage unit to Nigeria. ECF 166-3, at 8–9. According to Mbanusi, the items were personal property that she delivered to family in Nigeria without making a profit. *Id.*; ECF 158, at 6–8, 20. According to Liberty Mutual, Mbanusi was conducting business with the electronics, and the contents of the storage unit were business property. ECF 149-1, at 2; ECF 149-3, at 2, 7–8.

On July 21, 2018, a pipe burst in Mbanusi's storage unit, causing water damage to her stored property, including the electronics. ECF 166-3, at 9. On July 22, 2018, Mbanusi contacted Liberty Mutual, and on July 23, 2018, she filed a claim for water damage. ECF 149-5, at 15; ECF 158-20 (Liberty Mutual log); ECF 165-3, at 2 (Mbanusi's statement, verified at ECF 166, at 1, that she first called Liberty Mutual on July 22 but did not speak with a representative about her claim until July 23). By July 24, 2018, Liberty Mutual had retained Electronic Restoration Services to inspect the electronics. ECF 158-16, at 7 (undisputed findings of fact by the Maryland Insurance Administration ("MIA")). An ERS representative called Mbanusi on July 25, and when the representative did not reach Mbanusi, she sent Mbanusi an email that said: "I wanted to schedule a time and day for our technicians to come out to your storage unit and pick up the electronic devices that were affected by the water loss." ECF 149-5, at 14. Mbanusi called Liberty Mutual

the next day to ask why "ERS was wanting to pick up items for repair" and complaining that she did not want the items to be repaired because she would not be able to resell them. *Id.* at 13.

The parties dispute whether Liberty Mutual asked ERS to retrieve the items for inspection or to inspect them on site. Mbanusi provided a verified statement that claims adjuster Luis Villatorio told her on July 26, 2018 that "he would have a third party pick the items up from [Mbanusi's] storage" and that Liberty Mutual "would retain [a] third-party firm to retrieve and document [her] damaged belongings." ECF 165-3, at 3. Mbanusi asked for "Liberty Mutual to assess the damages first" before retaining a third party. *Id.* According to Mbanusi, Villatorio insisted that ERS "would need to pick up the items," and he cautioned that if Mbanusi did "not allow them to come and carry the items, there will be NO COVERAGE." *Id.* at 4. A year later, in May 31 and August 7, 2019 emails, Villatorio said Liberty Mutual retained ERS only to inspect the items, not to pick them up or to repair them. ECF 158-9, at 1; ECF 158-11, at 1.[1]

ERS did not pick up the items immediately after the pipe burst. ERS scheduled pick-up appointments with Mbanusi for July 31 and August 9, 2018, but Mbanusi cancelled both times. *Id.* at 12–13; ECF 158-16, at 7–8. Mbanusi states that the times ERS proposed did not work with her schedule. ECF 165-3, at 4–5. ERS eventually picked up Mbanusi's items in September 2018. ECF 158-29, at 1 (Mbanusi's timeline of events). Mbanusi states that she had photographs of the water damage before ERS took possession of the items and that ERS also took photographs. ECF 158-24, at 60, 65; ECF 165-3, at 4, 5. On August 29, 2018, she emailed Liberty Mutual photographs of the water damage. ECF 158-30. The photographs are not in the record.

---

[1] Mbanusi argues that Liberty Mutual admitted in its motion to dismiss that it retained ERS to pick up the items. ECF 165-1, at 2. Not so. Liberty Mutual accepted Mbanusi's allegations as true solely for purposes of the motion to dismiss, arguing that Mbanusi's failure to act in good faith claim was subject to dismissal as a matter of law. *See* ECF 8-1, at 2.

On October 29, 2018, Mbanusi contacted Liberty Mutual asking for an update on her claim and questioning the delay. ECF 149-5, at 12. On November 12, 2018, ERS notified Liberty Mutual that it had picked up Mbanusi's items and cleaned their exteriors. ECF 158-16, at 8. ERS explained that it brought Mbanusi's items to its facility where it inventoried the items, cleaned them, "put [them] into hydroxyl room for dryout," and stored them in bubble wrap. ECF 149-5, at 9; ECF 149-8. Mbanusi contacted Liberty Mutual "several times between January 3, 2019 and March 5, 2019" but did not hear back. ECF 158-35, at 2 (Nov. 30, 2021 MIA ltr.). Liberty Mutual paid ERS $4,750.00 for its work. ECF 149-5, at 7–8; ECF 149-9; ECF 149-10; ECF 149-6, at 8–9; ECF 158-16, at 8.

On July 23 and August 7, 2019, Liberty Mutual notified Mbanusi that she needed to schedule a delivery date for ERS to return her items. ECF 158-16, at 9. Mbanusi told Liberty Mutual's adjuster that, when she and ERS were scheduling the return of her items, any delay on her part was due to her medical appointments and a hospitalization. ECF 158-16, at 10; ECF 149-5, at 4. Mbanusi states that ERS delivered her property to her on September 16, 2019, approximately one year after the water pipe burst. ECF 158-29, at 3; *see* ECF 149-5, at 2. ERS provided a 36-page inventory and assessment of 447 items of property. ECF 149-8. The inventory noted pre-existing scratches, marks, cracks, and other damage. *Id.* It did not note any mold. *See id.*

Mbanusi maintains that when ERS returned her property to her, it was damaged by mold. ECF 149-5, at 2. She also insists some items were broken and a couple were missing. *Id.* Mbanusi contacted Liberty Mutual on September 27, 2019 to make a second claim, this time for mold damage. *Id.* Mbanusi retained Bentech Computer and Electronic Repairs ("Bentech") to inspect the property, and Bentech found that there was mold "surrounding those individually wrapped electronic items." ECF 158-12 (Oct. 7, 2019 Bentech ltr.).

Liberty Mutual concluded there was no evidence of mold when ERS received the property or when ERS returned it. ECF 158-25, at 3. After reviewing photographs from Mbanusi that she said showed mold, Liberty Mutual concluded that "[i]t appear[ed] that the ink had bled on the label." *Id.* Liberty Mutual consulted with ERS, which "confirmed the items had no mold at delivery and the black and white photos are not showing any damage other tha[n] what they believe to be ink bleeding on the labels due to the chemicals used in cleaning." *Id.*

On November 25, 2019, Liberty Mutual denied the mold damage claim on the ground that, even if there was mold, it was not caused by the water damage and thus it was not a covered loss. ECF 149-12; ECF 149-6, at 9–10.[2]

On September 13, 2022, Mbanusi filed suit against Liberty Mutual, alleging it had breached the insurance contract by denying coverage for the water and mold damage, had negligently handled her property after the water damage, and did not act in good faith during the claims handling process. ECF 3. Liberty Mutual filed an answer to the breach of contract and negligence claims, ECF 7, and filed a motion to dismiss the failure to act in good faith claim, ECF 8, which the Court granted, ECF 18. The parties proceeded to discovery, which was riddled with disputes and protracted. During the lengthy discovery period, Mbanusi moved to amend her complaint to add claims; the Court denied the motion. ECF 34, 104 & 105. Now, with discovery complete, the parties have fully briefed cross-motions for summary judgment. ECF 149, 149-3, 158, 161, 163. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025).

---

[2] Mbanusi argues that Liberty Mutual admitted to the presence of mold at a subsequent MIA hearing. ECF 158, at 9. On the contrary, Liberty Mutual maintained at the hearing that there was no evidence of mold. ECF 158-16, at 11–12. In any event, whether there was mold was not material to Liberty Mutual's denial of the claim. *See* ECF 149-12.

## II.    Standard of Review

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When presented with cross-motions for summary judgment, the Court "must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger*, 122 F.3d 58, 62 n.4 (1st Cir. 1997) (citation and internal punctuation omitted)). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). The Court must "view the evidence in the light most favorable to the nonmoving party" and avoid "weigh[ing] the evidence or mak[ing] credibility determinations." *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017) (quoting *Jacobs v. N.C. Admin. Off. of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015)) (internal quotation marks omitted). However, the Court also must abide by its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993) (quoting *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)) (internal quotation marks omitted).

If the moving party demonstrates "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmoving party to "present specific facts showing that there is a genuine issue for trial." *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). A factual dispute is genuine only where there is sufficient evidence to permit a reasonable jury to find in the nonmoving party's favor. *Id.*; *see also Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019). "To create a genuine issue for trial, 'the nonmoving party

must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.'" *Humphreys & Partners Architects*, 790 F.3d at 540 (quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013)). "Instead, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, 'citing to particular parts of the materials of record.'" *United States v. 8.929 Acres of Land in Arlington Cnty.*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(c)(1)(A)).[3]

## III.    Discussion

### A.  Claims before the Court

The only pending claims are Mbanusi's breach of contract and negligence claims. In her motion, Mbanusi refers to claims for gross negligence, negligence per se, intentional infliction of emotional distress, and negligent supervision; a RICO claim; and violations of Md. Code Ann., Ins. § 27-303. ECF 158, at 14–17. But none of those claims was pled in her complaint, and they are not pending before the Court. *See* ECF 3. Further, § 27-303 "provides administrative remedies only"; it "does not provide or prohibit a private right or cause of action to, or on behalf of a claimant or other person in any state." Ins. § 27-301(b)(2); *see also Hencken v. Servpro of Carroll Cnty.*, No. 1104, Sept. Term, 2022, 2024 WL 910327, at *10 (Md. App. Ct. Mar. 4, 2024). Moreover, Maryland law does not recognize a claim for negligence per se. *See Hughes v. Costco Wholesale Corp.*, No. LKG-23-2997, 2024 WL 2882179, at *3 (D. Md. June 7, 2024) ("[N]egligence *per se* is not an independent cause of action under Maryland law."); *Hanson v. Hanson*, No. GLR-19-2214, 2020 WL 4734313, at *2 (D. Md. Aug. 14, 2020).

---

[3] Mbanusi presents several challenges to the evidence on which Liberty Mutual relies. ECF 158, at 1–4. The Court has not relied on any of the challenged evidence. The Court does rely on Liberty Mutual's July 9, 2019 letter to Mbanusi, but only for a proposition that Mbanusi does not dispute: The letter made Mbanusi aware that Liberty Mutual was capping its coverage for the water damage to the property in her storage unit at $250.

### B.  Breach of Contract

The Court liberally construes Mbanusi's complaint to allege two breaches of contract: Liberty Mutual failed to pay her more than $250 for the July 2018 water damage to her property, and Liberty Mutual refused to cover the mold damage to her property that occurred when it was under Liberty Mutual's control after the water damage.

"In Maryland, 'the interpretation of an insurance policy is governed by the same principles generally applicable to the construction of other contracts . . . .'" *Mitchell v. AARP Life Ins. Program, New York Life Ins. Co.*, 779 A.2d 1061, 1069 (Md. Ct. Spec. App. 2001). The interpretation of an insurance policy, like the interpretation of any other contract, "is ordinarily a question of law for the court." *Jos. A. Bank Clothiers, Inc. v. J.A.B.-Columbia, Inc.*, No. ELH-15-3075, 2017 WL 6406805, at *7 (D. Md. Dec. 15, 2017); *see Clendenin Bros. Inc. v. U.S. Fire Ins. Co.*, 889 A.2d 387, 393 (Md. 2006). Thus, "the court bears responsibility for ascertaining the scope and limitations of an insurance policy." *Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.*, 611 F. Supp. 3d 41, 51 (D. Md. 2020) (citing *Fister v. Allstate Life Ins. Co.*, 783 A.2d 194, 199 (Md. 2001)).

When determining "the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself." *Id.* (quoting *Universal Underwriters Ins. Co. v. Lowe*, 761 A.2d 997, 1005 (Md. Ct. Spec. App. 2000)). The court considers the insurance policy's plain language and generally assigns "the words and phrases . . . their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Id.* (quoting *Universal Underwriters*, 761 A.2d at 1005). If it is evident that the parties intended specific terms to have "a special or technical meaning," such as if the "'policy defines a term in a manner which differs from the ordinary understanding of that term,'"

then "those words are construed in accordance with that understanding." *Id.* (quoting *Valliere v. Allstate Ins. Co.*, 596 A.2d 636, 638 (Md. 1991)). If a policy term is ambiguous, that is, "'if, to a reasonably prudent person, the term is susceptible to more than one meaning,'" then "the court may consult 'extrinsic sources' to ascertain the meaning." *Id.* at 51–52 (quoting *Cole v. State Farm Mut. Ins. Co.*, 753 A.2d 533, 537 (Md. 2000)).

On a claim for breach of an insurance policy, "the insured bears the burden of proving every fact essential to his or her right to recovery, ordinarily by a preponderance of the evidence." *Gen. Ins. Co. v. Walter E. Campbell Co.*, 241 F. Supp. 3d 578, 597 (D. Md. 2017) (citing *N. Am. Acc. Ins. Co. v. Plummer*, 176 A. 466, 469 (Md. 1935)), *aff'd sub nom. Gen. Ins. Co. v. United States Fire Ins. Co.*, 886 F.3d 346 (4th Cir.), *as amended* (Mar. 28, 2018). If the insured meets its burden and the "insurer [has] relie[d] upon a policy exclusion to deny coverage, the insurer bears the burden of proving that the exclusion applies." *Ellicott City Cable, LLC v. Axis Ins. Co.*, 196 F. Supp. 3d 577, 584 (D. Md. 2016) (citing *Finci v. Am. Cas. Co.*, 593 A.2d 1069, 1087 (Md. 1991)). Maryland, "[u]nlike the majority of other states, . . . does not follow the rule that insurance policies are to be most strongly construed against the insurer." *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 699 A.2d 482, 494 (Md. Ct. Spec. App. 1997). Even so, under Maryland contract law, "if an insurance policy is ambiguous, it will be construed liberally in favor of the insured and against the insurer *as drafter of the instrument.*" *Id.* (emphasis in original). Additionally, "[b]ecause 'exclusions are designed to limit or avoid liability, they will be construed more strictly than coverage clauses and must be construed in favor of a finding of coverage.'" *Bethany*, 611 F.3d at 52 (quoting *Megonnell v. United Servs. Auto. Ass'n*, 796 A.2d 758, 772 (Md. 2002)).

### 1. Claim for Water Damage

Liberty Mutual argues that Mbanusi's breach of contract claim based on the denial of coverage for the water damage to her property is barred by the statute of limitations. Under Maryland law, the statute of limitations for breach of contract claims is three years. Md. Code Ann., Cts. & Jud. Proc. § 5-101. A statute of limitations begins to run when "all of the elements of a cause of action have occurred so that it is complete." *Caruso Builder Belle Oak, LLC v. Sullivan*, 330 A.3d 666, 676 (Md. 2025) (quoting *Shailendra Kumar, P.A. v. Dhanda*, 43 A.3d 1029, 1034 (Md. 2012)) (emphasis removed). But, under the discovery rule, "even if all the elements for a cause of action have been met," the claim does not accrue until the plaintiff "'knew or reasonably should have known of the wrong.'" *Id.* (quoting *Cain v. Midland Funding, LLC*, 256 A.3d 765, 783 (Md. 2021)). In other words, "the cause of action accrues when the wrong is discovered or when with due diligence it should have been discovered." *Poffenberger v. Risser*, 431 A.2d 677, 679 (Md. 1981); *see Caruso*, 330 A.3d at 676 (discussing rule from *Poffenberger*).

A plaintiff "should have known of the wrong" when they are on "'inquiry notice.'" *Caruso*, 330 A.3d at 676 (quoting *Windesheim v. Larocca*, 116 A.3d 954, 962 (Md. 2015)). A plaintiff is on inquiry notice when they have "knowledge of circumstances which ought to have put a person of ordinary prudence on inquiry (thus, charging the individual) with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued." *Id.* (quoting *Windesheim*, 116 A.3d at 962–63). Thus, a party asserting a breach of contract claim must file suit within three years of when they knew or should have known the facts giving rise to the alleged breach. *See id.*

Under Maryland law, the elements of a breach of contract claim are (1) the defendant owed the plaintiff a contractual obligation, (2) the defendant breached that obligation, and (3) the

plaintiff was damaged by the breach. *Parkway 1046, LLC v. U.S. Home Corp.*, 961 F.3d 301, 307 (4th Cir. 2020). Liberty Mutual owed Mbanusi a contractual obligation to provide coverage up to $100,000 for water damage to Mbanusi's personal property and up to $250 for water damage to her business property located outside her home. While the parties dispute whether Liberty Mutual breached the contract by limiting coverage for the loss caused by water damage to $250, there can be no dispute that Mbanusi knew about the facts giving rise to the alleged breach more than three years before she filed this suit. The water pipe burst in her storage unit on July 21, 2018. Within two days, Mbanusi filed a claim with Liberty Mutual for loss caused by the water damage. Almost a year later, in a July 9, 2019 letter, Liberty Mutual informed Mbanusi that the "claim[ed] 'business property' status" applied to the property in her storage unit and coverage for the loss was capped at $250. ECF 159, at 7; ECF 149-4. This communication—which Mbanusi does not dispute she received in July 2019—made her aware that Liberty Mutual would not pay more than $250 for the water-damaged property. Thus, as of July 2019, Mbanusi knew the facts underpinning her breach of contract claim. Mbanusi had until July 2022 to bring the claim, but she did not file suit until September 13, 2022. By then, the statute of limitations had expired two months earlier.

Mbanusi argues that "Liberty Mutual's evidence concealments, manual hiding, and knowledge of concealment . . . tolls any limitations period until discovery of their misconduct under established Maryland law." ECF 158, at 19. She insists Liberty Mutual "concealed material evidence . . . , including: Claims Handling Manual . . . Financial evidence showing $14,381.73 payment to ERS" and "Timeline evidence proving predetermined ERS deployment." ECF 163, at 2. She asserts that "[u]nder Maryland law, concealment prevents limitations from running when defendant's conduct prevents plaintiff from discovering their claim." ECF 158, at 19 (citing *Poffenberger v. Risser*, 290 Md. 631 (1981)). She argues that Liberty Mutual's "own records

demonstrate that adjustment activities continued through 2020" and that "[u]nder Maryland law, an insurer cannot continue adjusting a claim while asserting that the statute of limitations bars recovery." ECF 163, at 2.

The equitable doctrine of fraudulent concealment allows a court to toll a statute of limitations when the defendant has engaged in a "wrongful . . . effort . . . to prevent the plaintiff from suing." *Edmonson v. Eagle Nat'l Bank*, 922 F.3d 535, 549 (4th Cir. 2019) (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990)). This doctrine, however, does not apply here because there is no evidence (and Mbanusi does not argue) that Liberty Mutual prevented her from suing. Although Mbanusi mentions that Liberty Mutual's "adjustment activities continued through 2020," ECF 163, at 2, she complains only about Liberty Mutual's conduct *after* she filed suit.

There is no genuine dispute that Mbanusi's breach of contract claim based on the denial of coverage for water damage accrued more than three years before she filed suit. The claim is barred by the statute of limitations. Liberty Mutual is entitled to summary judgment on this claim. *See Adams v. Am. Optical Corp.*, 979 F.3d 248, 252 (4th Cir. 2020) (affirming summary judgment in the defendant's favor because the plaintiff's claims were barred by the statute of limitations).

### 2. Claim for Mold Damage

Mbanusi's second breach of contract claim is that Liberty Mutual refused to cover the loss resulting from mold damage to her property that occurred when the property was in ERS's possession after the water damage. She insists that the mold damage "resulted from covered water peril" and that the damage to her items in ERS's possession was so severe that the items could not be restored. ECF 158, at 10. According to Mbanusi, Liberty Mutual was obligated to pay the full replacement cost for the items.

Liberty Mutual asserts that it properly denied her claim because, assuming there was mold damage, there is "no additional coverage for mold unless the loss is directly from any of the covered perils [insured against]." ECF 149-3, at 11. Liberty Mutual acknowledges that water damage is a covered peril but insists any mold damage did not directly result from the water damage. As Liberty Mutual sees it, any mold damage resulted directly from ERS's "faulty" workmanship, which is not a covered peril and occurred after the water damage, and therefore, the mold damage is not a covered loss. ECF 149-3, at 11 (citing ECF 149-6, at 10).

The "accidental discharge of water" is a "covered loss" under the insurance policy, and "mold . . . resulting directly from any covered loss" also is covered. ECF 149-7, at 19, 44. So, if the mold resulted directly from the accidental discharge of water caused by the pipe bursting, Liberty Mutual was obligated under the policy to cover the loss caused by the mold.

The parties do not identify any case law interpreting what "resulting directly" means. Maryland courts have not said much on the topic, but a couple Maryland cases offer helpful guidance. In *Simkins Industries, Inc. v. Lexington Insurance Co.*, the insured filed insurance claims after its power plant and property within the plant were damaged by a flood. 401 A.2d 181, 182 (Md. Ct. Spec. App. 1979). A tropical storm had caused the water in the river next to the power plant to rise, and downed trees knocked out pipes that crossed the river and connected to the power plant. *Id.* at 182–83. As a result, the pipes tore out of the power plant, the building lost part of a wall, and water flooded the building. *Id.* at 183. Also, the turbines inside the building were damaged when the turbines' steam pipes were torn out and sand and silt got inside the turbines. *Id.* at 187. The insurance policy with Hartford Steam Boiler Insurance and Inspection Company ("Hartford") "provided $2,000,000 of coverage (with a $25,000 deductible) for loss 'from an Accident . . . to an Object' and for 'loss on the property of the Insured directly damaged by such

Accident.'" *Id.* Hartford argued that "the damage to the turbines was indirect and therefore not covered by its policy." *Id.* at 190. The court concluded that Hartford was not entitled to a directed verdict regarding damage to the turbines because "there was sufficient evidence from which the jury could find that the damage to the turbines was the direct result of the accident which broke the steam pipes and permitted mud or debris to enter therein." *Id.* The *Simkins* Court observed that in a case decades earlier against Hartford, "an insurance policy limited recovery to 'immediate' damage to property caused by the explosion of certain steam boilers," and Maryland's highest court "held that this meant that the damage must be direct or proximate, as distinguished from remote, and therefore water damage from a sprinkler system which was set off by a boiler explosion was held to be proximately caused by that explosion." *Id.* (discussing *Hartford Steam Boiler Inspection & Ins. Co. v. Sonneborn & Co.*, 54 A. 610 (Md. 1903)).[4]

Another Maryland case is instructive on what "resulting directly" means. In *Johnson v. State*, 329 A.3d 364, 369 (Md. App. Ct. 2024), the court interpreted the term "direct result" when it analyzed whether a court may order a defendant to make restitution under Md. Code Ann., Crim. Proc. § 11-603. Under that statute, a court may order restitution if "as a direct result of the crime or delinquent act, property of the victim was stolen, damaged, destroyed, converted, or unlawfully obtained, or its value substantially decreased" or "as a direct result of the crime or delinquent act, the victim suffered: (i) actual medical, dental, hospital, counseling, funeral, or burial expenses or losses; (ii) direct out-of-pocket loss; (iii) loss of earnings; or (iv) expenses incurred with rehabilitation[.]" *See Johnson* , 329 A.3d at 369 (discussing *Goff v. State*, 875 A.2d 132, 142 (Md. 2005)). To determine whether a victim's damages were a "direct result" of the crime, the *Johnson*

---

[4] Damages are "proximate" if they are "[i]mmediately before or after" the event or "[v]ery near or close in time or space" to the event. *Proximate*, *Black's Law Dictionary* (12th ed. 2024).

Court "appl[ied] the language's natural and ordinary meaning." *Id.* (quoting *Goff*, 875 A.2d at 142). The court held that "something is a 'direct result' where there is no intervening agent or occurrence separating the criminal act and the victim's loss." *Id.* (quoting *In re Cody H.*, 156 A.3d 823, 838 (Md. 2017)). The court noted that "'direct injury' is defined in *Black's Law Dictionary* as '[a]n injury resulting directly from a particular cause, *without any intervening causes.*'" *Id.* (quoting *Direct Injury*, *Black's Law Dictionary* (11th ed. 2019) (emphasis added in *Johnson*)).

Applying these cases here and giving the policy language its natural and ordinary meaning, the Court finds that "mold resulting directly from any covered loss" is mold that resulted immediately from the accidental discharge of water, without any intervening causes. There is no evidence in the record that mold was present immediately after the pipe burst in July 2018. Photographs of the property taken shortly after the pipe burst were shared with Liberty Mutual, but Mbanusi does not assert that those photographs show mold was present then. ECF 158-24, at 60, 65; ECF 165-3, at 4, 5; ECF 158-30. And when ERS first inventoried the property in September 2018, ERS did not note the presence of mold. *See* ECF 149-8. The only evidence of mold is Bentech's October 7, 2019 assessment of the property after ERS returned it to Mbanusi in September 2019—more than one year after the pipe burst. ECF 158-12. Between the pipe burst in July 2018 and the first evidence of mold damage in September 2019, there were several intervening events: ERS's removal, bubble wrap, and year-long retention of the property. These intervening events are potential causes of the mold damage.

Contrast these facts with the facts in *Simkins* where there was evidence that property was directly damaged by a flood. Recall that the flood ripped the pipes from turbines, which immediately allowed sand and silt to enter and damage the turbines. No intervening events occurred and scarcely any time had passed between the flood and the sand and silt buildup that

15

damaged the turbines. Here, in contrast, there is no evidence that mold resulted immediately from the accidental discharge of water. On the contrary, the evidence shows that any mold occurred after ERS moved, bubble wrapped, and stored the property. These are potential intervening causes of the mold that break the direct causal chain. Because the mold, if it existed, did not result directly from the accidental discharge of water, the mold is not a covered loss. Liberty Mutual was not obligated under the policy to cover any damage caused by mold, and Liberty Mutual did not breach the contract by denying coverage for the mold damage. Liberty Mutual is entitled to judgment as a matter of law on this breach of contract claim.

## C. Negligence

Mbanusi may not have a breach of contract claim based on the denial of coverage for the alleged mold damage, but she is not without recourse. Mbanusi has submitted sufficient evidence to support her claim that Liberty Mutual was negligent in its handling of her property after the pipe burst. Mbanusi's negligence claim survives summary judgment.

To prevail on her negligence claim, Mbanusi must demonstrate "1) that the defendant was under a duty to protect the plaintiff from injury, 2) that the defendant breached that duty, 3) that the plaintiff suffered actual injury or loss, and 4) that the loss or injury proximately resulted from the defendant's breach of that duty." *Steamfitters Loc. Union No. 602 v. Erie Ins. Exch.*, 233 A.3d 59, 72 (Md. 2020) (quoting *Rowhouses, Inc. v. Smith*, 133 A.3d 1054, 1066 (Md. 2016)).

The Court first determines whether Liberty Mutual had a duty to protect Mbanusi's property from damage. *See 100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 9 (Md. 2013) ("Whether a legal duty exists between parties is a question of law to be decided by the court."). A duty is "an obligation to which the law will give effect and recognition to conform to a particular standard of conduct toward another." *Balfour Beatty Infrastructure, Inc. v. Rummel*

16

*Klepper & Kahl, LLP*, 155 A.3d 445, 451 (Md. 2017) (quoting *Jacques v. First Nat'l Bank*, 515 A.2d 756, 758 (Md. 1986)). Whether a duty exists "depend[s] upon the specific facts and circumstances presented." *Steamfitters*, 233 A.3d at 73. A duty exists if "the plaintiff's interests merit 'legal protection' from the defendant's conduct." *Sadler v. Loomis Co.*, 776 A.2d 25, 38 (Md. Ct. Spec. App. 2001) (quoting *Coates v. So. Md. Elec. Coop., Inc.*, 731 A.2d 931, 936 (Md. 1999)). "'It is a settled and familiar proposition that not every duty assumed by contract will sustain an action sounding in tort.' There are situations, however, when responsibilities imposed by a contractual relationship are supplemented with tort duties." *100 Inv. Ltd. P'ship*, 60 A.3d at 10 (quoting *Mesmer v. Md. Auto. Ins. Fund*, 725 A.2d 1053, 1058 (Md. 1999)) (other citations omitted). "The law generally recognizes a tort duty of care arising from contractual dealings with professionals such a physicians, attorneys, architects, and public accountants." *Id.* at 12 (quoting *Jacques*, 515 A.2d at 763).

The Court also must determine what the duty, or "standard of care," is. *See Am. Radiology Servs., LLC v. Reiss*, 236 A.3d 518, 531 (Md. 2020). "Generally, the applicable standard of care" is to "act[] reasonably as measured against a hypothetical 'reasonable' similar actor in similar circumstances." *Id.* (quoting *Armacost v. Davis*, 200 A.3d 859, 872 (Md. 2019)); *see Osiris Holding of Md., LLC v. Daniels*, 330 A.3d 735, 752 (Md. App. Ct. 2025) (quoting *Am. Radiology* and *Armacost*). When the defendant "has special training and expertise" in their profession, their conduct is "measured against the standard of a hypothetical reasonable person with similar training and expertise." *Armacost*, 200 A.3d at 872. The duty of care that a professional owes their client "is beyond the duty that would be owed by a general member of the public and . . . is commensurate with the professional's training and expertise." *Id.*

17

The Court finds that Liberty Mutual, a property insurer, had a duty, separate and apart from its contractual obligations, to exercise reasonable care with its insured's property while evaluating the property during the claims handling process. Mbanusi submitted a claim for insurance coverage to Liberty Mutual when the property in her storage unit sustained water damage. In response to her claim, Liberty Mutual retained ERS to inspect the property and told Mbanusi that ERS would report on any damage to the property. Then, ERS took possession of Mbanusi's property for over a year. When Liberty Mutual exercised control over the property by retaining ERS and telling Mbanusi that ERS needed to evaluate the damage for purposes of processing a claim made under its policy, Liberty Mutual had a duty to exercise reasonable care with the property.

Liberty Mutual does not argue that it did not owe Mbanusi a duty of care when it exercised control of her property during the claims handling process. Instead, Liberty Mutual points the finger at ERS, arguing that only ERS may be liable to Mbanusi in negligence because any mold damage to her property happened after ERS removed the property from Mbanusi's storage unit and took possession of it. Liberty Mutual argues that ERS should have inspected the property on site, as Liberty Mutual had directed. But there is evidence that Liberty Mutual paid ERS for its services, including those services it now claims exceeded the scope of its assignment. If ERS acted as its agent, Liberty Mutual may be liable in negligence for the authorized actions of ERS. *See Beahm v. Erie Ins. Exch.*, 309 A.3d 1, 10–11 (Md. App. Ct. 2024) (noting insured could sue insurer for agent's negligence in not offering insured full amount of uninsured motorist coverage) (citing *Popham v. State Farm Mut. Ins. Co.*, 634 A.2d 28 (Md. 1993)).

"[A]n agency relationship exists when a principal 'manifests assent' to an agent 'that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" *Krakauer v. Dish Network, L.L.C.*, 925 F.3d

643, 659–60 (4th Cir. 2019) (quoting Restatement (Third) of Agency, § 1.01). When there is a principal–agent relationship, "[the] principal is liable for the actions of [the] agent that are within the scope of the principal's apparent, as well as actual, authority." *Fontell v. Hassett*, 870 F. Supp. 2d 395, 413 (D. Md. 2012) (citing *Am. Soc. of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982))); *see Krakauer*, 925 F.3d at 660. "'Generally, the existence and scope of agency relationships are factual matters,' and are therefore often appropriately left to the jury." *Krakauer*, 925 F.3d at 660 (quoting *Metco Prods., Inc., Div. of Case Mfg. Co. v. NLRB*, 884 F.2d 156, 159 (4th Cir. 1989)). Here, it is undisputed that Liberty Mutual retained ERS to inspect the property. But neither party has provided enough evidence of the companies' relationship for the Court to determine the extent of Liberty Mutual's control over ERS and whether ERS's actions, including its removal of Mbanusi's property from the storage unit, its bubble-wrapping of the property, and its storage of the property for a year, were within the scope of any agency relationship. Thus, the Court cannot determine on the record before it whether ERS acted as Liberty Mutual's agent.

Whether Liberty Mutual acted on its own or through an agent, the insurer owed its insured a duty of care when it evaluated the property during the claims handling process.[5] But whether Liberty Mutual can be held liable for ERS's actions cannot be resolved on the record before the Court.

Turning from duty to breach, the Court finds a genuine dispute of material fact exists about whether Liberty Mutual breached its duty of care. Mbanusi has identified evidence that Liberty

---

[5] Mbanusi argues that Liberty Mutual breached a duty owed to her under Maryland Insurance Code § 27-303 and pursuant to its Claims Handling Manual. ECF 158, at 14, 15. But, in her complaint, Mbanusi did not allege negligence based on violations of the Insurance Code or the Claims Handling Manual, and the Court will not consider whether a duty is owed under either the code or the manual. *See* ECF 3. Mbanusi also insists Liberty Mutual's violations of § 27-303 constitute negligence per se, ECF 158, at 15, but Maryland does not recognize a claim of negligence per se.

Mutual, as part of the claims handling process, required her to turn over her property to ERS for inspection, that ERS retained her property for more than a year, and that mold was found on the property when ERS returned it to her in September 2019. For its part, Liberty Mutual has identified evidence that there was no mold on Mbanusi's property when ERS returned it to her. Liberty Mutual's call log from November 13, 2019 states that "the black and white photos are not showing any damage other tha[n] what [ERS] believe[d] to be ink bleeding on the labels due to the chemicals used in cleaning," ECF 158-25, at 3. Based on the current record, a jury could find that Liberty Mutual unreasonably required Mbanusi to allow ERS to remove her property from the storage unit to evaluate it; that ERS, acting as Liberty Mutual's agent, improperly packaged or stored her property; or that ERS, acting as Liberty Mutual's agent, unreasonably retained her property for more than a year. Thus, there is evidence on which a jury could find that Liberty Mutual breached its duty to exercise reasonable care in handling Mbanusi's property. Alternatively, a jury could find that there was no mold on the property when it was returned to Mbanusi; that it was reasonable for Liberty Mutual to require Mbanusi to allow ERS to remove Mbanusi's property from the storage unit for inspection; that ERS was not acting as Mbanusi's agent; that ERS properly packaged and stored the property; or that it was reasonable for ERS to retain the property for more than a year.

Turning from breach to proximate cause, the Court finds a genuine dispute of material fact about causation. A negligent act is the proximate cause of an injury if it is both the "cause in fact" and "a legally cognizable cause." *CR-RSC Tower I, LLC v. RSC Tower I, LLC*, 56 A.3d 170, 195 (Md. 2012) (quoting *Pittway Corp. v. Collins*, 973 A.2d 771, 786 (Md. 2009)). The defendant's conduct is "a cause in fact" if it "actually produced [the] injury." *Macias v. Summit Mgmt., Inc.*, 220 A.3d 363, 376 (Md. Ct. Spec. App. 2019) (quoting *Troxel v. Iguana Cantina, LLC*, 29 A.3d

1038, 1055 (Md. Ct. Spec. App. 2011)). The defendant's conduct is "a legally cognizable cause" if "the harm that occurred was a foreseeable result of [that conduct]." *See id.* The Court "consider[s] whether the actual legal harm to a litigant falls within a general field of danger that the actor should have anticipated or expected." *Neal v. United States*, No. ELH-19-1033, 2022 WL 1155903, at *13 (D. Md. Apr. 19, 2022) (quoting *Pittway Corp.*, 973 A.2d at 787–88). Typically, "[p]roximate cause is . . . a question for the trier of fact, unless only one possible inference may be drawn from the facts of a case." *Macias*, 220 A.3d at 376.

Mbanusi has submitted evidence from which a reasonable jury could conclude that Liberty Mutual's conduct proximately caused the mold damage. No more than two days after the pipe burst, Mbanusi reported the water damage to Liberty Mutual. Liberty Mutual immediately told her it would send ERS to inspect the property. Mbanusi offers evidence that on July 26, 2018, five days after the pipe burst, a Liberty Mutual claims adjuster told her: "If you do not allow [ERS] to come and carry the items, there will be NO COVERAGE." ECF 165-3, at 4. If Mbanusi is correct, she had no choice but to hand over her property to ERS. Once the property was in ERS's possession, it is undisputed that ERS bubble wrapped the property and that ERS possessed the property for over a year. From this evidence, a reasonable jury could find that ERS's packaging and lengthy retention of the wet property caused mold to grow and that the mold was a foreseeable result of ERS's conduct. Thus, a jury could conclude that Liberty Mutual's conduct proximately caused mold damage to Mbanusi's property.

In its motion for summary judgment, Liberty Mutual does not separately address Mbanusi's negligence claim. It lumps the breach of contract and negligence claims together, proclaiming— without discussing a single element of negligence—that Mbanusi's "breach of contract and negligence claims . . . fail as a matter of law because [Liberty Mutual] did not breach the policy"

and it "did not . . . engage in negligence in the adjustment of Plaintiff's claims." ECF 149-3, at 7, 12. Liberty Mutual insists the mold resulted from "the negligence of ERS," which the policy did not cover and for which ERS is the proper defendant. *Id.* at 11. In its reply and opposition to Mbanusi's motion for summary judgment, Liberty Mutual adds this argument:

> In addition to the arguments and authorities advanced in Defendant's Motion for Summary Judgment, Plaintiff also has failed to support a claim for negligence in this matter. In particular, she has not submitted admissible proof showing to a reasonable degree of professional certainty that the Defendant breached a duty of care to her, and that the alleged breach was a proximate cause of damages. In order to prevail on these claims, and because the adjustment and disposition of insurance claims is subject matter beyond the expertise of a lay person, Plaintiff was required, but failed, to identify an expert to address the standard of care, causation, and the damages allegedly caused by that negligent conduct.

ECF 161, at 8. Liberty Mutual does not, however, cite any caselaw in support of these undeveloped arguments.

"Expert testimony is not required to establish the standard of care 'in every case involving alleged negligence by a professional' because 'sometimes the alleged negligence, if proven, would be so obviously shown that the trier of fact could recognize it without expert testimony.'" *Osiris*, 330 A.3d at 752 (quoting *Schultz v. Bank of Am., N.A.*, 990 A.2d 1078, 1086 (Md. 2010)). "Expert testimony is *required* 'only when the subject of the inference . . . is so particularly related to some science or profession that is beyond the ken of the average layman . . . .'" *Steamfitters Loc. Union No. 602 v. Erie Ins. Exch.*, 209 A.3d 158, 173–74 (Md. Ct. Spec. App. 2019) (quoting *Johnson v. State*, 179 A.3d 984, 994 (Md. 2018)) (collecting cases), *aff'd*, 233 A.3d 59 (Md. 2020)). "When a court considers whether testimony is beyond the ken of the average layman, the question is not whether the average person is already knowledgeable about a given subject, but whether it is within the range of perception and understanding." *Osiris*, 330 A.3d at 752 (quoting *State v. Galicia*, 278 A.3d 131, 159 (Md. 2022)). Thus, "[i]f a jury can use its common knowledge or experience to

recognize a breach of a duty, then expert testimony is unnecessary to calibrate the exact standard of care owed by the defendant." *Id.* (quoting *Jones v. State*, 38 A.3d 333, 348 (Md. 2012)); *see Steamfitters*, 209 A.3d at 173–74 (expert testimony "is not required on matters of which the jurors would be aware by virtue of common knowledge"); *CIGNA Prop. & Cas. Cos. v. Zeitler*, 730 A.2d 248, 261 (Md. Ct. Spec. App. 1999) (noting "the duty to render a professional judgment regarding a subrogation clause in a commercial lease is beyond the ken of the average juror," whereas "the issue concerning the duty to inform a client that the coverage actually obtained differs from what was sought is, ordinarily, not beyond the understanding of the average juror").

Here, expert testimony is not necessary for the jury to determine whether Liberty Mutual breached its duty of care to Mbanusi during the claims handling process when ERS took possession of her property for more than a year. Nor is expert testimony required to determine whether the breach was the proximate cause of the mold damage. This case is not about the specialized work that an insurance company performs when it adjusts and handles claims. It is about the care the insurer took—or failed to take—during the claims handling process. Liberty Mutual offers no reason why an average juror cannot determine, by virtue of common knowledge and experience, whether it breached its duty of care and proximately caused the mold damage. Thus, Liberty Mutual has not met its burden of showing that Mbanusi's failure to procure expert testimony dooms her negligence claim as a matter of law.

Neither party is entitled to summary judgment on the negligence claim.

### D. Proper Defendant

Liberty Mutual contends it is entitled to summary judgment because Mbanusi sued "Liberty Mutual Insurance Company," not "LM Insurance Corporation," and failed to correct the error after Liberty Mutual notified her of the error in its partial answer, ECF 7. Mbanusi counters

23

that Liberty Mutual "filed Notice of Removal as 'Liberty Mutual Insurance Company'" and filed a "Disclosure of Corporate Interest confirming this identity," and therefore it cannot now claim that the proper defendant is "LM Insurance Corporation." ECF 158, at 2.

The Court will not grant summary judgment on this basis. Rather, the Court will update the docket to reflect the name of the proper defendant, LM Insurance Corporation.

## IV.     Conclusion

Liberty Mutual Insurance Co.'s motion for summary judgment, ECF 149, is granted as to Mbanusi's breach of contract claims and denied as to Mbanusi's negligence claim. Mbanusi's cross-motion for summary judgment, ECF 158, is denied. Mbanusi's negligence claim is the only remaining claim. The Clerk shall update the docket to name the proper defendant, LM Insurance Corporation.

March 27, 2026
Date

Deborah L. Boardman
United States District Judge